*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-016

JULY TERM, 2013

| | |
|---|---|
| In re T.G., Juvenile | } APPEALED FROM: |
| | } |
| | } Superior Court, Windsor Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 70-7-09 Wrjv |

Trial Judge: Howard A. Kalfus

In the above-entitled cause, the Clerk will enter:

Mother and father appeal termination of their parental rights to their daughter T.G., born in April 2003. On appeal, mother argues that the court's findings failed to account for the evidence regarding the strength of the mother-child bond. Father contends that the Department for Children and Families (DCF) violated a court order in setting a permanency goal as adoption and not providing father with services, and that DCF failed to make reasonable efforts to achieve its case plan goal. We affirm.

At the time of T.G.'s birth, mother reported that the child was the product of rape and that the biological father was unknown. In July 2009, the State filed a petition alleging that T.G. was a child in need of care or supervision (CHINS) for lack of proper parental care. DCF alleged that mother had physically and verbally abused T.G. The court adjudicated T.G. as CHINS, and, in August 2009, granted DCF custody of T.G. DCF placed T.G. with a foster family, where she has remained. T.G. has been diagnosed with adjustment disorder with anxiety resulting from her life experiences. She also has disorganized detachment disorder.

In July 2010, DCF petitioned to terminate mother's residual parental rights. At some point after the petition was filed, mother identified father as T.G.'s biological father. The two were reunited and married. In December 2010, paternity was confirmed with genetic testing. DCF then filed to terminate father's rights in January 2011. Hearings on the TPR petitions were held in March 2011 and the court issued a decision in August 2011. The court noted that father had just recently appeared and that it was too early to determine whether his reemergence would be positive or negative for either mother or T.G., and denied the petition as to father for further evaluations to be performed. The court found that mother demonstrated poor judgment and placed her needs ahead of T.G.'s and that she had become defensive and combative with DCF.

Nonetheless, the court found that mother and T.G. have a close relationship and that DCF had failed to show her progress had stagnated because she was making efforts to improve her ability to care for T.G. The court explained that there was insufficient evidence as to whether the parents' marriage would provide stability and allow mother to resume her parenting duties. Therefore, the court denied termination. The court continued custody with DCF and directed as

follows: "DCF is requested to prepare a case plan that attempts to integrate mother and father as much as possible consistent with the child's best interests, with consideration given to the complicated nature of the situation and to any events that have transpired since the close of the evidence." The court invited the parties to request a status conference "to discuss the next steps in the case."

Following the court's decision, a permanency hearing was held in September 2011 before a different judge than had presided over the termination hearing. DCF proposed a permanency plan with a single goal of adoption and the judge commented that she believed that goal to be inconsistent with the denial of termination "unless and until there have been new developments." Father's attorney expressed opposition to the goal and sought visitation for father with T.G. A permanency planning hearing was held in October 2011 at which DCF presented a permanency plan with dual goals of termination and reunification. Mother and father both objected to the plan. The court explained that it needed a professional recommendation as to "what would be in the child's best interest to establish the child's relationship with [father]." The court ordered an evaluation of father to collect some information about father's skills and abilities as a parent and how best to introduce the child to father.

In January 2012, DCF filed petitions to terminate mother's and father's parental rights. At a hearing in February 2012, father's counsel complained that he was still not having visitation with T.G. The State noted that father had not moved for contact and that father had not yet participated in an evaluation. The court again emphasized the importance of the evaluation. Father did not file a separate motion for visitation before the termination hearing was held in August 2012.

Following a two-day hearing, the court issued a written order. Based on the evidence, the court found that T.G. and her mother have a good relationship, but that T.G. is "somewhat 'parentified.'" The court explained that T.G. feels responsible for mother and puts her mother's needs ahead of her own in the way a parent normally would for a child. Mother has a traumatic brain injury and suffers from post-traumatic stress disorder (PTSD). Mother received family time coaching for three years, but made limited progress due to an inability to receive feedback.

As to father, the court found that T.G. has "virtually no relationship with her father." As of the time of the final hearing, T.G. knew him only as her mother's former friend and current husband. He was not introduced to her as a father and has not had visits with her. The court noted that since March 2011, the parents have been evicted from their home and experience marital problems. Although their living situation was stable at the time of the hearing, it was only in place for several months.

The court found stagnation as to both parents, finding mother had been unable to gain or improve her parenting skills, and father had failed to make efforts to improve his parenting or seek visitation with T.G. The court concluded that termination was in T.G.'s best interests and granted the petitions. Both parents appeal.

When termination of parental rights is sought, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291 (1994); see 33 V.S.A. § 5113(b). The court must first find that there has been a substantial change in material circumstances, and, second, find that termination of parental rights is in the child's best interests. In re B.W., 162 Vt. at 291. A

2

substantial change in material circumstances is most often found when a "parent's ability to care for a child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). On appeal, we will affirm the trial court's findings unless they are clearly erroneous, and we will affirm its conclusions if supported by the findings. In re B.S., 166 Vt. 345, 350 (1997).

As to father's appeal, DCF first argues that father filed his appeal late. The termination order was entered on December 10, 2012, therefore a notice of appeal needed to be filed by January 9, 2013. V.R.A.P. 4 (appeal must be filed with thirty days of entry of judgment). Father filed his appeal one day late on January 10, 2013. Therefore, we agree with the State that father's appeal was untimely filed. On appeal, father argues that we should entertain his appeal in the interest of justice because the late filing was not a result of his own inaction. In support, he attaches an affidavit from his attorney averring that she mailed the notice of appeal on January 8, 2013, assuming it would arrive at the courthouse one day later.

We find this case similar to In re A.D.T., 174 Vt. 369, 375 (2002), in which we held that the furtherance of justice required adjudicating the mother's appeal from a termination of parental rights order where the mother's attorney simply missed the appeal deadline and admitted there was "really no excuse for it," and the mother wrote the trial court asking for permission to appeal the order within days of being informed of the court's decision. As in A.D.T., father here requested that his counsel appeal before the appeal period had lapsed, and it was counsel's actions that resulted in the late filing. Consequently, we address the merits of father's appeal "to advance the interests of justice and fundamental fairness." See id.

Father first argues that DCF failed to comply with a court order by continuing to pursue the goal of adoption following denial of termination and failing to provide a plan of services to father. Father objects to DCF's proposed permanency plan submitted by DCF in September 2011 and having a sole goal of adoption. Father claims DCF violated the denial of termination in proposing adoption as the only goal. We disagree. Certainly, any permanency plan following the denial of termination required court approval and DCF's September 2011 proposed permanency plan was not approved by a court. In making its proposal, DCF was not, however, violating a court order. The termination decision directed DCF to prepare a case plan, but did not predetermine what the permanency goal should be, recognizing that consideration would have to be given to the child's best interests, "the complicated nature of the situation," and to "events that have transpired since the close of evidence." Therefore, DCF's action of proposing a plan with the goal of adoption did not violate a court order. Moreover, DCF subsequently withdrew that plan, and changed its recommended case plan to include concurrent goals of adoption and reunification.

Father's argument concerning the case plan is essentially that DCF failed to provide him with services and therefore any stagnation was not attributable to him. See In re S.R., 157 Vt. 417, 421-22 (1991) (recognizing that stagnation cannot be based on factors beyond parent's control). Father contends that DCF denied him an opportunity to prove that he could parent his daughter, and therefore his lack of progress was beyond his control. The court's findings do not support father's position. The court noted that "DCF's failure to work productively with father is troubling," but found that father's lack of progress was not attributable to factors outside his control. The court found that father knew about mother's pregnancy and subsequent birth and did not pursue whether he was the child's father at that point. See In re C.L., 2005 VT 34, ¶ 15, 178 Vt. 558 (explaining that father's effort to discover paternity of child relevant to whether

3

separation with child result of state's actions). Following the identification of him as T.G.'s father, the court also found that father contributed to a lack of progress on the issues of contact with T.G. and improvement of father's parenting skills. The court explained: "[Father] did not ask the court to intervene such that he could begin visitation. Moreover, he could have sought parenting education on his own but failed to do so." These findings are supported by the record and support the court's conclusion that father's stagnation was not caused by factors outside his control.

Father's next argument is that DCF failed to make reasonable efforts to finalize a case plan, and this error requires reversal of the termination decision. As we have recently explained, the reasonable-efforts determination "is separate from whether termination of parental rights is in a child's best interests" because "[t]he extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors." In re C.P., 2012 VT 100, ¶ 38. Termination depends on an assessment of the child's best interests, not on a finding of reasonable efforts. Here, the court's unchallenged findings support its conclusion that termination of father's residual rights was in T.G.'s best interests. Father has very limited parenting experience, has virtually no relationship with T.G., and is unable to acquire the skills necessary to assume a parenting role within a reasonable time as measured from T.G.'s perspective. In re C.L., 2005 VT 34, ¶ 17 (explaining that critical question is whether parent can assume parental responsibilities within reasonable time as measured from perspective of child's needs). Thus, the court did not err in terminating father's rights.

Next, we address mother's appeal. Mother argues that the court misapprehended the mother-child relationship and the importance of maintaining it. Mother emphasizes that the qualities of the parent-child bond and the parent's role in the child's life are two of the four statutory best-interests factors. 33 V.S.A. § 5114(a)(1), (4). Mother contends that the court misapprehended the record when it found that mother does not play a constructive role in T.G.'s life. In support, mother emphasizes the testimony of T.G.'s therapist that T.G. and her mother have a special relationship and that it will be a loss to T.G. if contact is discontinued.

We conclude there was no error. The family court's decision reflects its careful and thorough analysis of the evidence, and there is no support for mother's suggestion that the court failed to consider all of the testimony. See In re M.B., 162 Vt. 229, 239 (1994) (rejecting parent's claim that family court failed to carefully examine evidence, and finding that parent's "vague and conclusory allegation of error . . . falls far short of demonstrating clear error"). The court acknowledged that T.G. and mother had a "good relationship," but determined it was not a constructive bond. The court explained that T.G. had taken on a parental role because she feels responsible for mother and mother puts her needs ahead of T.G.'s. To the extent that T.G.'s therapist testified that severance of the parent-child bond would be a loss T.G., such testimony is not inconsistent with the court's findings regarding the whether the bond was constructive.

Moreover, the court's other unchallenged findings support its conclusion that termination of mother's parental rights was in T.G.'s best interests. The court found that T.G. has a strong relationship with her foster parents and is adjusted very well to her current home, school and community. 33 V.S.A. § 5114(a) (listing best interests factors, including child's relationship with parents and foster parents, and child's adjustment to home, school and community). On the most important factor—whether mother could resume parenting within a reasonable time—the court found that mother had made "only minimal progress" in improving her parenting skills and

4

would not be able to resume parenting T.G. within a reasonable period of time. Therefore, the court decision to terminate mother's rights is supported by its findings.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Brian L. Burgess, Associate Justice